UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

GREG GREEN,

    Petitioner,

    v.

SHERRY HARTFORD,

    Respondent.

CASE NO.  C04-2129-RSL-MJB

REPORT & RECOMMENDATION

## INTRODUCTION

Petitioner Greg Green is a Washington state prisoner who has filed a *pro se* petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. Petitioner was convicted in 1999 of attempted first-degree murder and is currently serving a sentence of 320 months in prison. Respondent has filed an answer to the petition, and petitioner has filed a reply. After considering the briefs and the balance of the record, the court recommends that the petition be denied.

## BACKGROUND

The Washington Court of Appeals summarized the facts in petitioner's case as follows:

> On October 25, 1997, Rio Cole, a marijuana dealer, was shot and robbed. Cole testified that Greg Green and James Elliott robbed him and Green shot him.
>
> For several years, Cole had supplied marijuana to his friends Will King and Andre Brown. During the summer prior to the shooting, Cole also

REPORT & RECOMMENDATION
PAGE 1

supplied marijuana to their friends: Donte Perry, Wassell Grissom and Elliott.[1] Cole saw Green, Perry's cousin, at least once during that summer when he sold some marijuana to Brown. Both Brown and Cole testified that on that occasion, Green looked at Cole in a menacing manner.

On October 23, 1997, two days before Cole was shot and robbed, Perry called Cole, on behalf of Grissom and Elliott, and asked if he would sell them a pound of marijuana. Cole agreed to sell a pound for $4,000 and brought the marijuana to Perry's, Grissom's, and Elliott's apartment. Perry, Grissom, and Elliott were present during the transaction with Cole.[2]

Cole testified that two days later, on October 25, 1997, Perry called to negotiate another sale, this time for two pounds of marijuana. Cole agreed to sell Perry two pounds for $8,000. Perry and Elliott agreed to split the purchase. Perry told Cole he would send two people over to Cole's apartment with the money. Elliott testified that Perry said his cousin, Green, would bring his half of the money and go with Elliott to Cole's apartment.

That afternoon, Elliott and Green drove in a van to buy the marijuana.[3] Elliott called Cole from a payphone near the apartment complex to get further directions. Cole walked up the street and met Elliott and Green. He got in the van and directed Elliott, who was driving, to his apartment.

They arrived at Cole's apartment in Tukwila a few minutes later. Cole's girlfriend, Erika Sampson, and their two young children were also there. Cole's two-year old son was sleeping on the floor in the living room. Green and Elliott sat on the couch and Cole went to get the marijuana. When Cole returned, he placed a duffel bag containing two pounds of marijuana by Elliott's feet and sat down. The three watched a football game while Elliott examined the marijuana. Green then asked to use the restroom and Cole directed him to the bathroom down the hall. When Green returned, he was holding a gun with a laser site pointed at Cole. Cole said "I didn't know it was like this...." [Footnote omitted]. Cole looked at Elliott, who appeared shocked, and told him to take the marijuana.

Green ordered Cole to get down on the floor. Cole got on his knees and Green told him to lie flat. Green then directed Elliott to take the

---

[1] [Footnote in original]. Perry is also known as "Eric Green". Grissom also goes by the name "Smiley", and Elliott goes by the name "Buster".

[2] [Footnote in original]. Up until trial, Cole maintained that he sold marijuana on this occasion to Green and Elliott, rather than Grissom and Elliott. But at trial, he said he had seen Grissom in person twice after the shooting, once at the courthouse and once at a nightclub, and after seeing him, he realized that it was Grissom, not Green, who bought the pound of marijuana a couple of days before the shooting.

[3] [Footnote in original]. Grissom rented the van in Portland several weeks before, and it was used communally by the group of friends.

REPORT & RECOMMENDATION
PAGE 2

marijuana and leave. Elliott grabbed the duffel bag, but had difficulty opening the front door. He dropped the duffle bag, eventually opened the door, and left. Cole looked up at Green. As Green backed out of the apartment, he shot Cole. The first shot hit Cole in the mouth and face and the second hit him in the arm. Green picked up the duffel bag of marijuana and joined Elliott in the van.

Erika Sampson testified that she saw two African-American men arrive at the apartment in a van with Cole. She was in the kitchen when she heard Cole exclaim they "didn't have to do this." [Footnote omitted]. Sampson moved towards the living room and saw Cole lying on the floor and one of the men pointing a gun at him.[4] Frightened, she backed into the kitchen. She then heard the shooter fire two shots and leave. Sampson immediately called 911. Police and medics arrived shortly thereafter. Cole was bleeding profusely from his mouth, neck, and arm. He had lost teeth and had difficulty speaking. When asked, he told the police that "two men" shot him. An ambulance took Cole to Harborview Medical Center for treatment.

Elliott testified that after leaving Cole's apartment, he drove to a house where he knew some people and got a ride from them back to the apartment he shared with Perry and Grissom. When he arrived at the apartment, several people were there, including Green and Grissom.

Grissom testified that he was taking a nap when he heard people talking loudly. As he came out of his room, Elliott said that he and Green had "hit a lick," meaning that they had robbed someone. Green displayed a 9 millimeter (mm) handgun with a laser site and put it on the counter. Green said he shot Cole, but did not know if he was dead. He then put ziplock bags of marijuana on the counter.

By the following day, Green, Elliott, Grissom and Perry had all fled the state.

In a statement to the police after the shooting, Sampson said she thought the person who shot Cole was driving the van. She could not positively identify either Green or Elliott from photo montages. She could not identify who shot Cole when she testified at trial.

During their search of Cole's apartment, the police found a half-pound of marijuana and approximately $8,000 in a safe. In the living room, they recovered two shell casings and bullet fragments from a 9 mm gun.

Two days after the shooting, Tukwila police detective William Bales interviewed Cole at Harborview. Cole told him that Elliott and Green were the two men who came to purchase marijuana and Green was the one who

---

[4] She said the gun appeared to be 9 mm.

REPORT & RECOMMENDATION
PAGE 3

shot him.[5] In January 1998, Cole selected and identified both Green and Elliott from photo montages.

In February 1998, the State entered into a written agreement with Cole. The State agreed not to prosecute or file charges for the drugs found in his apartment if he agreed to testify at trial.

In March 1998, the State charged Green with first degree assault. In March or April 1999, Green was arrested in California. Green admitted that he knew Cole, but said he did not know Cole had been shot. Green asked if Elliott was in custody and if Elliott had said he shot Cole.

After Green's arrest the State filed an amended information and charged Green and Elliott with first degree attempted murder. Elliott eventually turned himself in and pleaded guilty to second degree robbery. As a part of the plea agreement, Elliott agreed to testify in the trial against Green, cooperate with the police in their investigation of the case, give a statement and be interviewed about the case.

At trial, the State charged Green with first degree attempted murder and, in the alternative, first degree assault. The sole issue at trial was the identity of who shot Cole. The State relied on the testimony of Cole, Grissom and Elliott to identify Green as the shooter.[6] Green argued that Cole's identification of him as the shooter was unreliable and was based on his mistaken belief that the person who shot him was the same person who purchased marijuana two days before the shooting. Green also claimed that Will King, who visited Cole at Harborview shortly after the incident, suggested that Cole name him as the shooter. Green argued that Grissom, who is physically similar to Green, was the shooter and that Elliott, Brown, King and their other friends liked Grissom but did not like Green.[7] Finally, Green introduced lyrics written by Grissom to a rap song found in the van that described a similar robbery using a gun with a laser to support his theory that Grissom shot Cole.

After a month-long trial, the jury found Green guilty of attempted murder in the first degree, while armed with a firearm.[8]

(Doc. #11, Ex. 4 at 2-7).

---

[5] [Footnote in original]. He knew Elliott only as "Buster" and only knew Green's first name, Greg.

[6] [Footnote in original]. Green did not testify.

[7] [Footnote in original]. There was no evidence to support Green's theory that King disliked Green or had a motive to accuse him. Nor did the evidence support the theory that Green was uniformly disliked by the group of friends or that there was a conspiracy among them to falsely implicate him in the crime.

[8] [Footnote in original]. He was sentenced within the standard range.

REPORT & RECOMMENDATION
PAGE 4

Petitioner appealed to the Washington Court of Appeals. The court affirmed petitioner's conviction and sentence. *See Washington v. Green*, 119 Wash. App. 15 (2003). Petitioner then petitioned the Washington Supreme Court for discretionary review. The court denied review. (Doc. #11, Ex. 6). The Washington Court of Appeals issued its mandate on August 3, 2004.

On August 30, 2004, petitioner filed a personal restraint petition in the Washington Court of Appeals. (Doc. #21, Ex. 9). That petition was recently denied after briefing was complete in this matter. *See In re: Green*, No. 54838-7-1, Wash. Ct. App. (Order of Dismissal entered on August 11, 2005).

Petitioner filed the present petition for a writ of habeas corpus on October 25, 2004. (Doc. #4). Respondent filed her first answer on November 22, 2004. (Doc. #10). In her answer, respondent did not address the merits of petitioner's petition but instead argued that because petitioner had a personal restraint petition ("PRP") pending in state court, his federal habeas petition was premature and should be dismissed. On December 10, 2005, petitioner filed a response to the answer, contending that the issues presented in his PRP dealt only with *Blakely v. Washington*, 124 S. Ct. 2531 (2004), and waiving his right to include such issues in his habeas proceeding. Accordingly, the court on June 9, 2005 directed respondent to file a second answer addressing the merits of petitioner's petition. (Doc. #19).

On June 28, 2005, respondent filed a second answer to the petition, along with additional exhibits supplementing the state court record.[9] (Doc. #20, #21). On July 13, 2005, petitioner filed a response to the second answer. (Doc. #22). The matter is now ready for review.

## CLAIMS FOR RELIEF

Petitioner raises the following claims for relief in his habeas petition:

1. Insufficient Evidence/Accomplice Liability.

2. Immunity Agreement/Gov. Vouching.

---

[9] The state court record is thus contained in two separate filings: Doc. #11 and Doc. #21.

REPORT & RECOMMENDATION
PAGE 5

     3. Prosecutorial Misconduct.

     4. Cautionary Instruction.

(Doc. #4 at 5-6).

In addition, petitioner raises a fifth claim in the memorandum he attached to his habeas petition:

     5. Cumulative Error.

(Doc. #4, Attachment at 21).

## DISCUSSION

### Exhaustion of State Court Remedies

At the outset, respondent argues that petitioner failed to properly exhaust his third and fifth claims and that they are now barred from review. In order to present a claim to a federal court for review in a habeas corpus petition, a petitioner must first have presented that claim to the state court. *See* 28 U.S.C. § 2254(b)(1). This exhaustion requirement has long been recognized as "one of the pillars of federal habeas corpus jurisprudence." *Calderon v. United States Dist. Ct. (Taylor)*, 134 F.3d 981, 984 (9th Cir. 1998). Underlying the requirement is the principle that, as a matter of comity, state courts must be afforded "the first opportunity to remedy a constitutional violation." *Sweet v. Cupp*, 640 F.2d 233, 236 (9th Cir. 1981).

In addition, a petitioner must not only present the state court with the *first* opportunity to remedy a constitutional violation, but a petitioner must also afford the state courts a *fair* opportunity. *Picard v. Connor*, 404 U.S. 270 (1971); *Anderson v. Harless*, 459 U.S. 4 (1982). It is not enough that all the facts necessary to support the federal claim were before the state courts or that a somewhat similar state law claim was made. *Harless*, 459 U.S. at 6. "[A] claim for relief in habeas corpus must include reference to a specific federal constitutional guarantee, as well as a statement of the facts that entitle the petitioner to relief." *Gray v. Netherland*, 518 U.S. 152, 162-63 (1996).

Finally, a petitioner must raise in the state court all claims that can be raised there, even if

the state court's review of such claims is purely discretionary. *See O'Sullivan v. Boerkel*, 526 U.S. 838, 841-47 (1999). In other words, a petitioner must invoke one complete round of a state's established appellate review process, including discretionary review in a state court of last resort, before presenting claims to a federal court in a habeas petition. *Id.* at 842-44.

Respondent concedes that here, petitioner fairly presented his third and fifth claims to the Washington Supreme Court by way of his petition for discretionary review. (Doc. #20 at 13-14). However, respondent asserts that complete exhaustion requires that petitioner present his claims to every level of the state court, including the intermediate court of appeals. Respondent is correct in this assertion. *See Casey v. Moore*, 386 F.3d 896 (9th Cir. 2004) (holding that habeas petitioner did not fairly present his claims to state court when he raised them for the first and only time upon petitioning for discretionary review to the Washington State Supreme Court).

Respondent contends that petitioner failed to fairly present his claims to the Washington Court of Appeals because he failed to alert that court as to the federal nature of his claims by citing to a federal case or constitutional provision. The court has reviewed the brief filed by petitioner in the court of appeals and concludes that respondent is correct. The section of the brief addressing petitioner's third claim here – prosecutorial misconduct – mentions only one federal case, *In re Winship*, 397 U.S. 358 (1970), which does not address prosecutorial misconduct. (Doc. #11, Ex. 2 at 31). The section of the brief addressing petitioner's fifth claim here – cumulative error – does not cite any federal case or constitutional provision. (*Id.* at 38-39).

While both sections of the brief refer generally to "due process" and the right to a fair trial, the Ninth Circuit has held that such vague references do not satisfy the exhaustion requirement. *See Hiivala v. Wood*, 195 F.3d 1098, 1106 (9th Cir. 1999) (holding that "general appeals to broad constitutional principles, such as due process, equal protection, and the right to a fair trial, are insufficient to establish exhaustion.") Thus, respondent is correct that petitioner failed to fairly

REPORT & RECOMMENDATION
PAGE 7

Case 2:04-cv-02129-RSL   Document 23   Filed 09/08/05   Page 8 of 18

present his third and fifth claims to the state court and they are unexhausted.[10]

In addition, it appears that petitioner's unexhausted claims would now be procedurally barred if he attempted to bring them before the state court. As mentioned, the Washington Court of Appeals recently denied petitioner's PRP. Under Washington law, petitioner is entitled to file only one PRP challenging his conviction and sentence. *See* RCW 10.73.140. Thus, any attempt by petitioner to exhaust these claims at this point would likely be deemed a successive petition and rejected by the state court.

When, as here, a petitioner has procedurally defaulted on a claim in state court, the petitioner "may excuse the default and obtain federal review of his constitutional claims only by showing cause and prejudice, or by demonstrating that the failure to consider the claims will result in a 'fundamental miscarriage of justice.'" *See Noltie v. Peterson,* 9 F.3d 802, 806 (9th Cir. 1993) (citing *Coleman v. Thompson,* 501 U.S. 722 (1991)). Petitioner appears to argue that "cause" exists because his appellate counsel failed to present the claims in state court and such failure constitutes ineffective assistance of counsel. (Doc. #22 at 20-21). However, petitioner's claim of ineffective assistance of counsel itself has not been presented to the state court. Thus, this claim too is unexhausted and cannot serve to excuse his procedural default. *See Tacho v. Martinez,* 862 F.2d 1376, 1381 (9th Cir. 1988) (holding that a petitioner who alleges ineffective assistance of appellate counsel as cause for procedural default must first raise the claim separately in state court).

---

[10] Petitioner appears to argue in his response that he properly exhausted his third and fifth claims in state court because, although he presented them as state law claims and did not cite federal law, he used terms in his brief which were identical to the terms he would have used *had* he cited federal law. (Doc. #22 at 18). The Supreme Court recently reserved this precise question for another day. *See Baldwin v. Reese*, 541 U.S. 27, 33-34 (2004). However, petitioner's theory is at odds with Ninth Circuit precedent. *See, e.g., Johnson v. Zenon*, 88 F.3d 828, 830 (9th Cir. 1996) ("If a petitioner fails to alert the state court to the fact that he is raising a federal constitutional claim, his federal claim is unexhausted *regardless of its similarity to the issues raised in state court*.") (emphasis added). *But see Jackson v. Edwards*, 404 F.3d 612, 621 (2nd Cir. 2005) (holding that petitioner exhausted his federal claim because "the legal standards for his federal and state claims were so similar that by presenting his state claim, he also presented his federal claim.")

Because the court has found no cause exists, it is unnecessary to discuss the second prong of the procedural default test, *i.e.*, whether petitioner suffered prejudice as a result. *See Thomas v. Lewis,* 945 F.2d 1119, 1123 n.10 (9th Cir. 1991). Therefore, petitioner has failed to show that "cause and prejudice" exist excusing his default on the unexhausted claim. Nor has he shown that failure to consider the claims will result in a miscarriage of justice. Accordingly, petitioner's third and fifth claims are barred from federal habeas review and should be denied.[11]

After setting forth the standard of review, the court will address petitioner's remaining claims.

## Standard of Review

Under the Anti-Terrorism and Effective Death Penalty Act, a habeas corpus petition may be granted with respect to any claim adjudicated on the merits in state court only if the state court's adjudication is *contrary to*, or involved an *unreasonable application* of, clearly established federal law, as determined by the Supreme Court. 28 U.S.C. § 2254(d) (emphasis added). Under the "contrary to" clause, a federal habeas court may grant the writ only if the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law, or if the state court decides a case differently than the Supreme Court has on a set of materially indistinguishable facts. *See Williams v. Taylor*, 529 U.S. 362 (2000).

Under the "unreasonable application" clause, a federal habeas court may grant the writ only if the state court identifies the correct governing legal principle from the Supreme Court's decisions but unreasonably applies that principle to the facts of the prisoner's case. *Id.* In

---

[11] Before leaving the exhaustion issue, the court must address one final question. Petitioner requests that if the court finds his third and fifth claims to be unexhausted, that he be permitted to "excise" the claims from his habeas petition. (Doc. #22 at 25). Petitioner relies upon *Calderon v. U.S. District Court*, 134 F.3d 981 (9th Cir. 1998) as authority for this request. However, petitioner's reliance on *Calderon* is misplaced. *Calderon* permits a district court to stay a habeas petition to allow a petitioner to return to state court to exhaust unexhausted claims. *Id.* at 988. Here, petitioner does not request a stay, nor does it appear that such a stay would benefit him, given that he has already brought one PRP in state court and a second one would likely be dismissed as successive. Therefore, the court denies his request to "excise" the unexhausted claims from the petition.

REPORT & RECOMMENDATION
PAGE 9

*Lockyer v. Andrade,* 538 U.S. 63 (2003), the Supreme Court clarified that the phrase "unreasonable application" is not synonymous with "clear error, " but means "objectively unreasonable." Thus, a state court's decision may be overturned only if the application is objectively unreasonable. 538 U.S. at 69.

In addition, relief may be granted on a federal habeas corpus petition only if the state court error had a "substantial and injurious effect or influence" in determining the jury's verdict. *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993). "Under this standard, habeas petitioners may obtain plenary review of their constitutional claims, but they are not entitled to habeas relief based on trial error unless they can establish that it resulted in 'actual prejudice.'" *Id.* (citations omitted). In rejecting a "harmless-beyond-a-reasonable-doubt" standard which was more favorable to petitioners, the Supreme Court stressed that habeas is an extraordinary remedy reserved only for those whom society has "grievously wronged." *Id.* (citations omitted).   Thus, even if a state court unreasonably applies the law, habeas relief may be granted only if the error "substantially influenced" the jury. *See Arnold v. Runnels*, __F.3d__, 2005 WL 2029557 at *7 (9th Cir., August 24, 2005).

<u>Petitioner's First Claim: Insufficient Evidence/Accomplice Liability</u>

Petitioner first claims that the state court unreasonably applied clearly established federal law when it concluded that a jury instruction given by the trial court was erroneous but the error was harmless. At issue is an instruction on accomplice liability, which stated in pertinent part:

> A person who is an accomplice in the commission of a crime is guilty of that crime whether present at the scene or not.
>
> A person is an accomplice in the commission of a crime if, with knowledge that it will promote or facilitate the commission of *a crime*, he or she either:
>
> (1) solicits, commands, encourages, or requests another person to commit the crime; or
>
> (2) aids or agrees to aid another person in planning or committing *a crime*.

(Doc. #11, Ex. 10, Instruction 20) (emphasis added).

REPORT & RECOMMENDATION
PAGE 10

The Washington Court of Appeals found that this instruction was erroneous because a recent case decided by the Washington Supreme Court had held that in order to mirror the exact language of the accomplice liability statute, the instruction should have used the words "the crime" instead of "a crime." *See State v. Cronin*, 142 Wash.2d 568, 579 (2000). As the court stated in *Cronin*: "[T]he putative accomplice must have acted with knowledge that his or her conduct would promote or facilitate *the* crime for which he or she is eventually charged," and not *any* crime. 142 Wash. 2d at 579 (emphasis added). However, the state court here found that the error was harmless, because the prosecutor did not argue that petitioner had acted as an accomplice, nor had petitioner defended himself on that basis. (Doc. #11, Ex. 4 at 15-18).

Respondent argues initially that a federal habeas court may not review a claim that a jury instruction is incorrect under state law. (Doc. #20 at 18). While this statement is generally true, an exception exists where the allegedly defective instruction "so infected the entire trial that the resulting conviction violates due process." *Carriger v. Lewis*, 971 F.2d 329, 334 (9th Cir. 1992). An erroneous instruction must be viewed in the context of the jury instructions as a whole and in light of the entire trial record. *See Estelle v. McGuire*, 502 U.S. 62, 72 (1991).

Here it does not appear that the erroneous instruction, when viewed against the trial record as a whole, meets the stringent standard applicable on habeas review. As stated above, the prosecutor did not argue to the jury that petitioner was guilty as an accomplice. The prosecutor argued that petitioner had shot Cole, not that petitioner had helped rob him and his accomplice, Elliott, had then shot Cole. And petitioner's defense was that he was not even in Cole's apartment when the robbery and shooting took place. In addition, the "to convict" instruction required jurors to find that petitioner "shot Rio Cole" and did not permit a conviction based on accomplice liability. (Doc. #11, Ex. 10, Instruction 13).

Indeed, given its apparent irrelevance to the proceedings, the state court of appeals concluded that the inclusion by the trial court of the accomplice instruction appeared to be "a mistake or an oversight." (Doc. #11, Ex. 4 at 16). While such a mistake may have slightly

REPORT & RECOMMENDATION
PAGE 11

confused the jury, in light of the fact that neither the prosecutor nor defense counsel referred to an accomplice theory of liability in their closing arguments, any confusion does not appear to have "so infected the entire trial" that the resulting conviction violates due process. Nor does any confusion appear to have had a "substantial and injurious effect or influence" in determining the jury's verdict. Therefore, the state court of appeals did not unreasonably apply federal law and petitioner's first claim should be denied.

<u>Petitioner's Second Claim:  Immunity Agreement/Gov. Vouching</u>

Petitioner next claims that the state court unreasonably applied federal law when it found that a second error made by the trial court – the introduction into evidence of the immunity agreement between the State and a key witness – was also harmless. The facts surrounding this claim were described as follows by the Washington Court of Appeals:

Use of the Immunity Agreement

> Cole entered into two separate agreements with the State to testify at Green's trial. First, in a written agreement dated February 1998 Cole agreed to appear at Green's trial and testify truthfully and to abandon any claim to the money seized at his apartment. The State agreed not to prosecute him or file drug charges based on the marijuana found in his apartment. [Footnote omitted]
>
> In a subsequent plea agreement related to two pending drug charges against Cole, the State dismissed a 1999 possession charge and amended a 1998 charge to a lesser charge of possession of marijuana in exchange for Cole's agreement to testify at Green's trial. The State also agreed to recommend a sentence of sixty days confinement and 12 months of community supervision for the 1998 drug offense.[12]
>
> Pretrial, the parties addressed the scope of examination about Cole's agreements with the State. While Green intended to ask Cole about the February 1998 immunity agreement and the favorable treatment he received with respect to the two later drug charges, he objected to the introduction of the February 1998 letter agreement as an exhibit. Green's objection was two-fold. First, he claimed "the language suggests it was written for the purpose of being admitted as an exhibit in court" and secondly, that the agreement was "self-serving to the State . . . ." Green particularly objected to the part of the agreement that stated:  *"The intent of this agreement is to secure the true and accurate testimony of your client*

---

[12] [Footnote on original] At trial, the State introduced Cole's plea agreement, the State's sentence recommendation and the amended information during its direct examination of Cole. Those exhibits are not a part of the record on appeal and Green does not challenge the admission of the documents and the agreement.

REPORT & RECOMMENDATION
PAGE 12

> *concerning his knowledge of the events surrounding the shooting and robbery of Rio Cole."* Green argued this language impermissibly vouched for Cole's credibility and improperly bolstered his testimony. Although Green objected to the admission of the agreement as an exhibit, he did not request that it be redacted.
>
> Because Green was going to question Cole about the immunity agreement, the State insisted it was entitled to introduce the letter agreement as an exhibit during its direct examination before Cole was impeached. The State said it did not intend to focus on the "testify truthfully" language or argue that Cole was credible because he testified consistently with the agreement. The trial court ruled that the February 1998 agreement was admissible as an exhibit in the State's case, particularly given the way the State intended to use it.

(Doc. #11, Ex. 4 at 7-8) (some footnotes omitted) (emphasis added).

Petitioner argues that introduction of Cole's immunity agreement during the prosecutor's direct examination of Cole, in particular the part that said its purpose was to "secure the true and accurate testimony of" Cole at trial, constituted a harmful error. Respondent argues initially that a claim challenging a state court's evidentiary ruling is not reviewable by a federal court in a habeas proceeding. Respondent concedes, however, that the claim is reviewable if the evidentiary ruling "violated the defendant's due process rights by rendering the proceedings unfair." *Hamilton v. Vasquez*, 17 F. 3d 1149, 1159 (9th Cir. 1994). With this standard in mind, then, the court will review petitioner's claim.

Petitioner draws an analogy between his case and a Ninth Circuit case, *United States v. Roberts*, 618 F.2d 530 (9th Cir. 1980), which cautioned against the use of immunity agreements. As the court in *Roberts* observed:

> A strong case can be made for excluding a plea agreement promise of truthfulness. The witness, who would otherwise seem untrustworthy, may appear to have been compelled by the prosecutor's threats and promises to come forward and be truthful. The suggestion is that the prosecutor is forcing the truth from his witness and the unspoken message is that the prosecutor knows what the truth is and is assuring its revelation. . . . .

618 F.2d at 535-36. Because of the danger of admitting an immunity agreement between the prosecutor and a witness, the *Roberts* court advised trial courts to "be alert to the problem of vouching before admitting a plea agreement containing a promise to testify truthfully." *Id.*

The rationale articulated in *Roberts* and also in a Second Circuit case, *United States v.*

REPORT & RECOMMENDATION
PAGE 13

*Arroyo-Angulo*, 580 F.2d 1137 (2nd Cir. 1978), was later adopted by the Washington Court of Appeals in *State v. Jessup*, 31 Wash. App. 304 (1982). In *Jessup*, the trial court admitted evidence of an immunity agreement between the State and several witnesses on direct examination. 31 Wash. App. at 316. Applying the *Roberts* principle, the court of appeals held that "the State should not have introduced the terms of the agreement on direct examination." *Id.* at 318.

It appears that here, the state trial court was not as alert to the danger of admitting the agreement between Cole and the prosecutor as it should have been under *Roberts* and *Jessup*. The court permitted the prosecutor to admit the agreement between Cole and the State before Cole's credibility had been attacked on cross-examination. The Washington Court of Appeals found this to be error. (Doc. #11, Ex. 4 at 10). However, the appellate court found the error to be harmless, for three reasons: First, the court found that "[b]ecause the agreement would have been admitted anyway," *i.e.,* after Cole's credibility had been attacked, its use beforehand was unlikely to have "materially affected" the outcome of the petitioner's trial. (*Id.* at 11). Second, unlike *Roberts*, where the prosecutor made "devastating use" of the agreement by emphasizing it during closing argument, the prosecutor here did not refer to the agreement during closing argument. (*Id.*) Finally, the court found that the prosecutor's case against petitioner did not rely solely upon Cole's testimony but was supported also by the testimony of Elliott and Grissom. (*Id.*)

Upon review of the record, the court concludes that the Washington Court of Appeals did not unreasonably apply federal law in reaching this decision. While the first reason given by the court of appeals is debatable, the second and third reasons are well-founded. As the court observed, the prosecutor in *Roberts* emphasized to the jury the importance of the agreement in assessing a key witness's credibility.[13] In contrast, here, it appears that the prosecutor's sole

---

[13] In *Roberts*, the prosecutor pointed out to the jury that "[the defendant] could be expected to lie to save himself, but that [the witness] would not lie for fear of violating his plea agreement and that a state police officer . . was monitoring [the witness's] testimony." 618 F.2d at 532.

REPORT & RECOMMENDATION
PAGE 14

reference to the agreement in closing argument was that petitioner had argued that Cole was biased against him because Cole "was going to get a deal on a drug case."[14] (Doc. #21, Ex. 37 at 135). In addition, despite the fact that petitioner attempted to undermine the credibility of Elliott and Grissom, it is undisputed that the testimony of Cole was supported by their testimony.

Thus, petitioner has not shown that the erroneous admission of the agreement violated his due process rights by rendering the entire proceedings unfair. *See Hamilton v. Vasquez*, 17 F. 3d 1149, 1159 (9th Cir. 1994). Petitioner's second claim for relief should consequently be denied.

Petitioner's Fourth Claim:  Cautionary Instruction

Petitioner's final claim is that the state court unreasonably applied federal law when it found that the trial court "did not abuse its discretion in declining to give a cautionary accomplice instruction." (Doc. #11, Ex. 4 at 15). The facts surrounding this claim were described by the Washington Court of Appeals as follows:

Cautionary Accomplice Instruction

Green requested the court give Washington Pattern Jury Instruction (WPIC) 6.05, a cautionary instruction, to the jury regarding Elliott's testimony because Elliott was an accomplice to the robbery.[15] WPIC 6.05 provides:

The testimony of an accomplice, given on behalf of the plaintiff, should be subjected to careful examination in the light of other evidence in the case, and should be acted upon with great caution. You should not find the defendant guilty upon such testimony alone unless, after carefully considering the testimony, you are satisfied beyond a reasonable doubt of its truth.

The Committee's note following WPIC 6.05 states that it should be given "in every case in which the State relies upon the testimony of an accomplice. Do not use this instruction if an accomplice or codefendant testifies for the defendant." WPIC 6.05 (Note on Use). The commentary to WPIC 6.05 says that the instruction is required only if the State relies "solely upon the uncorroborated testimony of an accomplice". WPIC 6.05 (Comment).

The State opposed Green's request to give WPIC 6.05. The State argued

---

[14] The prosecutor then attempted to argue that Cole in fact had already identified petitioner before Cole reached an agreement with the prosecutor, but defense counsel objected and the objection was sustained. (Doc. #21, Ex. 37 at 135).

[15] [Footnote in original]  Elliott testified he participated in robbing Cole. Green was charged only with attempted murder and assault, not robbery.

REPORT & RECOMMENDATION
PAGE 15

that the instruction should not be given because Elliott's testimony was corroborated by the testimony of Cole and Grissom. Although Green admitted there was testimony to corroborate Elliott, he argued that if the jury did not believe that evidence, then it could base its decision solely on Elliott's testimony. The trial court decided that because there was evidence corroborating Elliott's testimony, the instruction should not be given.

On appeal, Green argues that Elliott's testimony was not sufficiently corroborated and the trial court erred in not giving the cautionary instruction. We review a trial court's refusal to give proposed jury instructions, if based on a factual dispute, for an abuse of discretion.

The Washington Supreme Court has explained when a cautionary accomplice instruction is appropriate:

> (1) it is always the better practice for a trial court to give the cautionary instruction whenever accomplice testimony is introduced; (2) failure to give this instruction is always reversible error when the prosecution relies *solely* on accomplice testimony; and (3) whether failure to give this instruction constitutes reversible error when the accomplice testimony is corroborated by independent evidence depends upon the extent of corroboration. If the accomplice testimony was substantially corroborated by testimonial, documentary or circumstantial evidence, the trial court did not commit reversible error by failing to give the instruction.

*State v. Harris*, 102 Wash. 2d 148, 155 (1984) [emphasis in original].

(Doc. #11, Ex. 4 at 12-14).

The state court found that the issue in petitioner's case fell into the third category listed in *Harris*, which mandates a cautionary instruction unless "the accomplice testimony was substantially corroborated." It appears that the Ninth Circuit has a similar rule on when a cautionary instruction must be given regarding an accomplice's testimony: "Such an instruction must be given when requested by defense counsel, at least where the testimony of an accomplice is substantially uncorroborated." *United States v. Bosch*, 914 F.2d 1239, 1247 (9th Cir. 1990), *quoting United States v. Martin*, 489 F.2d 674, 677 n. 2 (9th Cir. 1973). Thus, the question here becomes whether the state court's application of this rule was unreasonable.

The state court analyzed whether the testimony of Elliott was substantially corroborated as follows:

> Green argues that the evidence did not substantially corroborate Elliott's

REPORT & RECOMMENDATION
PAGE 16

testimony because the testimony of Cole and Grissom was not persuasive. He points out that Cole had only seen him once prior to the incident and notes that when police arrived at the scene, Cole said that "two men" robbed and shot him. Green also relies on the fact that Cole initially claimed he had sold marijuana to him a few days before the shooting, and later admitted the prior sale had been to Elliott and Grissom. According to Green, Grissom was also not a credible witness because there was evidence linking Grissom to the crime which gave him a motive to falsely implicate Green.

There is no support for Green's argument that Elliott's testimony was not substantially corroborated because the credibility of witnesses was disputed. It is province of the jury to weigh the credibility of the witnesses and to decide what inferences to draw from the evidence. There was evidence substantially corroborating Elliot's testimony and the trial court did not abuse its discretion in declining to give a cautionary accomplice instruction.

(Doc. #11, Ex. 4 at 14-15).

The above analysis by the state court is not unreasonable. Petitioner's argument is essentially that an accomplice's testimony is uncorroborated, and therefore a cautionary instruction must be given, whenever evidence corroborating the testimony is "not persuasive." However, this does not appear to be a fair reading of the rule in Washington nor in the Ninth Circuit. Under petitioner's broad interpretation of the rule, the number of situations in which the cautionary instruction would be required would increase substantially, and trial courts would face difficult assessments as to whether corroborating evidence was "persuasive." In contrast to petitioner's interpretation of the rule, the standard, under federal law, is much narrower. The instruction needs to be given "only where there is a strong need for the instruction: for example, where the accomplice's testimony is *almost entirely uncorroborated and it is, as well, both critical and suspect*." *Bosch*, 914 F.2d at 1247 (citation omitted) (emphasis added).

Here, Elliott's testimony was not "almost entirely uncorroborated," nor was it both "critical and suspect." In fact, Elliott's testimony was corroborated by the testimony of Cole and Grissom, and while important to the prosecutor's case against petitioner, it could not be deemed "critical." Therefore, the Washington Court of Appeals did not unreasonably apply federal law in upholding the trial court's failure to give a cautionary instruction. Petitioner's fourth claim should therefore be denied.

REPORT & RECOMMENDATION
PAGE 17

## CONCLUSION

For the foregoing reasons, petitioner's petition for a writ of habeas corpus should be denied with prejudice. A proposed Order accompanies this Report & Recommendation.

DATED this 8th day of September, 2005.

*/s/ Monica J. Benton*
MONICA J. BENTON
United States Magistrate Judge

REPORT & RECOMMENDATION
PAGE 18